SECURITIES AND EXCHANGE COMMISSION, Applicant,

v.

Joseph **CARAMADRE, Raymour Radhakrishnan, Edward Hanrahan, Edward Maggiacomo, Jr., and Estate Planning Resources, Inc., Respondents.**

M.C. No. 10–52 S.

United States District Court, D. Rhode Island.

June 10, 2010.

Ellen B. Moynihan, Esq., John J. Kaleba, Esq., Rachel E. Hershfang, Esq., U.S. Securities and Exchange Commission, Boston, MA, for Plaintiff.

Robert G. Flanders, Jr., Esq., Hinckley, Allen & Snyder LLP, Providence, RI, for Defendant Joseph Caramadre and Estate Planning Resources, Inc.

Jeffrey B. Pine, Esq., Jeffrey B. Pine, Esq. P.C., Providence, RI, for Defendant Raymour Radhakrishnan.

John A. MacFadyen, III, Esq., MacFadyen, Gescheidt & O'Brien, Providence, RI, for Defendant Edward Hanrahan.

Anthony M. Traini, Esq., Providence, RI, for Defendant Edward Maggiacomo, Jr.

## OPINION AND ORDER

WILLIAM E. SMITH, District Judge.

The United States Securities and Exchange Commission (the "Commission" or the "SEC") has issued civil subpoenas to each of the Respondents in this matter, all of whom have refused to comply. The SEC now moves to compel Respondents to heed its requests. Respondents object, and seek a protective order delaying the return date for the subpoenas until a related criminal investigation is completed. They also ask the Court to prevent the parties in several related civil cases from surrendering certain documents to the Commission. For the reasons explained below, the Commission's motion is granted and Respondents' request for a protective order is denied.

### I. Background

This matter follows the Court's decision in *In re Grand Jury Proceedings*, 697 F.Supp.2d 262 (D.R.I.2010),[1] which allowed

---

1. This published opinion is a redacted version of a previously issued, sealed opinion. The names of the targets have been removed from the opinion; however, the targets have publicly identified themselves and have freely discussed their status both in connection with the pending Grand Jury investigation as well as the pending civil cases.

the United States (the "government") to take the extraordinary measure of deposing witnesses in a criminal investigation before any indictment had issued. The witnesses, who had information critical to the subject of the government's investigation, were all terminally ill and, by all accounts, had only weeks or days to live. For that reason, the Court held that the "interests of justice" warranted the depositions for the purpose of preserving trial testimony pursuant to Rule 15(a) of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 15(a).

Respondents here are subjects of the government's investigation, and also Defendants in a series of civil lawsuits pending before this Court. Both the investigation and those cases focus on an investment scheme allegedly devised by Respondents. The scheme purportedly involves convincing terminally-ill individuals to have variable annuities purchased in their names for the benefit of investors who are the legal owners of the annuities. The investors have the premiums used to buy the annuities invested in securities, while relying on options in the policies called "death benefits" as a hedge against losses. If the investments make money, everybody wins; if they do not, only the insurance company selling the annuity bears the loss.

After filing suit, the civil plaintiffs sought expedited discovery so that they, too, could interview the ailing witnesses before it was too late. They were granted permission to participate in the government's Rule 15 depositions, but not to initiate their own interviews. This compromise recognized the fact that the civil plaintiffs shared an interest in preserving trial testimony relevant to the civil claims. The arrangement also sought to minimize the burden on the witnesses.

The Commission has now commenced its own inquiry into whether the annuity transactions may have violated federal securities law. It has issued civil subpoenas directing all Respondents to produce relevant documents, and directing the individual Respondents to give testimony (the "Subpoenas"). Respondents have refused to obey those commands, prompting the Commission to file this action to enforce the Subpoenas. In response, Respondents object to the Subpoenas as unreasonable, and seek a protective order shielding them from the obligation to comply.

In addition, the Commission has subpoenaed the plaintiffs in the civil actions to produce transcripts of the three Rule 15 depositions they have attended. Respondents protest that disclosing any transcripts would be improper, and ask the Court to order the civil plaintiffs not to deliver them.

## II. Discussion

### A. Fifth Amendment objections

The first issue is whether Respondents must comply with the Subpoenas directed to them. The parties do not dispute that the subject matter of the Commission's investigation falls within its jurisdiction, or that the Subpoenas represent a valid exercise of the agency's authority. *See generally SEC v. Howatt*, 525 F.2d 226, 229 (1st Cir.1975) ("[T]he Commission's inquiry must be for a proper purpose; the information sought must be relevant to that purpose; and statutory procedures must be observed."). Rather, the disagreement centers on whether it is reasonable to enforce the Subpoenas now, during the ongoing criminal investigation.

 In general, parties must yield to subpoenas issued by the Commission to the extent that "compliance will not be unreasonably burdensome." *SEC v. Ar-*

*thur Young & Co.,* 584 F.2d 1018, 1024 (D.C.Cir.1978). As the First Circuit has observed:

> [A] court asked to enforce a subpoena has a broad power of inquiry to ensure that its process is not abused should, for example, the [g]overnment appear to be acting in bad faith. But, as the district court correctly recognized here, it is not the court's role to intrude into the investigative agency's function. Congress committed securities investigations to the SEC, not the courts.

*Howatt,* 525 F.2d at 229 (internal citations omitted). The mere existence of simultaneous criminal and civil proceedings does not, on its own, make an agency's civil subpoena unreasonable, or show evidence of "bad faith." *See id.*; *SEC v. Dresser Indus., Inc.,* 628 F.2d 1368, 1375 (D.C.Cir. 1980) (finding that the "interest of justice" did not require protecting a party subject to a criminal investigation from civil SEC subpoenas); *see also United States v. Kordel,* 397 U.S. 1, 11, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970) (holding that the FDA did not have to forbear from conducting a civil proceeding pending outcome of a criminal trial).

Nevertheless, Respondents contend that the Subpoenas place an unreasonable burden on their Fifth Amendment rights. Because of the criminal inquiry, Respondents have made it clear to the Commission that they will refuse to surrender documents or answer questions in response to the Subpoenas on Fifth Amendment grounds. The criminal probe compels them to take this stance even though they maintain they have done nothing wrong. Otherwise, in the event that charges are later filed against them, they may be held to have waived their privilege against self-incrimination with respect to the information sought in the Subpoenas. *See Microfinancial, Inc. v. Premier Holidays Int'l, Inc.,* 385 F.3d 72, 78 (1st Cir.2004) (indicating that a party can waive Fifth Amendment rights "with respect to the subject matter of ... deposition testimony" given in a civil case). The Commission acknowledges that Respondents plan to assert the right to remain silent.

■ Accordingly, Respondents argue that unleashing the Subpoenas on them now serves no investigative purpose. All the Commission wants, Respondents insist, is to force them to plead the Fifth in order to create and seize upon a tactical advantage. Respondents say the Commission hopes to use their silence as the basis for an adverse inference against them in any civil lawsuit it may later choose to file. It is well-established that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify." *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). According to Respondents, using the Subpoenas for the sole purpose of capturing adverse inferences at this stage exacts an impermissible penalty for preserving their Fifth Amendment privilege. Instead, Respondents propose that the Commission should wait until the criminal investigation has concluded. Respondents urge the Court to stay the Commission's hand until that time, when it will become clear whether they even need to worry about self-incrimination.

Because Respondents have not yet been charged with any crime, they face an uphill battle. "[A]n unindicted defendant who argues that going forward with a civil proceeding will jeopardize his Fifth Amendment rights usually presents a much less robust case for [the] extraordinary relief" of staying the matter. *Microfinancial,* 385 F.3d at 79. As fully explained below, in this case Respondents fail to demonstrate the need for the "extraordinary re-

lief" of curtailing the Commission's investigation.

### 1. Testimonial Subpoenas

 In resisting the proposed interviews, Respondents' argument veers off course in two places. First, it overstates the role of the Fifth Amendment in civil proceedings. "[W]hile a [civil] trial court should strive to accommodate a party's Fifth Amendment interests, it must also ensure that the opposing party is not unduly disadvantaged." *Serafino v. Hasbro, Inc.*, 82 F.3d 515, 518 (1st Cir.1996) (internal citations omitted). Accordingly, the First Circuit in *Serafino* established a balancing test to accommodate opposing interests: "the burden on the party asserting [the privilege] should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side." *Id.* (finding that the district court did not abuse its discretion in dismissing the case where the plaintiff refused to provide discovery on Fifth Amendment grounds).

Respondents spotlight the "no more than is necessary" language in *Serafino*. Whatever urgency the Commission asserts in seeking information, Respondents say, should not justify exposing them to adverse inferences at this stage. What saps the force from this reasoning is that *Serafino* cited *Baxter* as a touchstone for striking the right balance. The court explained that "the assertion of the privilege may sometimes disadvantage a party," because it might "allow[ ] adverse inferences to be drawn from a *civil* party's assertion of the privilege." *Id.* (citing *Baxter*, 425 U.S. at 318, 96 S.Ct. 1551) (emphasis in original). Those remarks show that the First Circuit does not consider the risk of adverse inferences to weigh heavily, if at all, against an opposing civil party's interests.

More to the point, many courts have concluded that the threat of adverse inferences does not demand a stay of agency enforcement actions during parallel criminal proceedings. For instance, in *Keating v. Office of Thrift Supervision*, 45 F.3d 322 (9th Cir.1995), the Ninth Circuit decided that the United States Office of Thrift Supervision ("OTS") could properly proceed against a defendant charged with state crimes, even though that meant he had to assert the Fifth Amendment privilege:

> We conclude that any remaining overlap between the OTS and criminal proceedings did not make the . . . refusal to stay the OTS proceeding an abuse of discretion. A defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege. Not only is it permissible to conduct a civil proceeding at the same time as a related criminal proceeding, even if that necessitates invocation of the Fifth Amendment privilege, but it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding.

*Keating*, 45 F.3d at 325–26 (citing *Baxter* ). Other courts have adopted a similar approach. *See U.S. Commodity Futures Trading Comm'n v. A.S. Templeton Group, Inc.*, 297 F.Supp.2d 531, 534–35 (E.D.N.Y.2003) (declining to stay civil agency enforcement action because of criminal investigation despite the threat of adverse inferences); *SEC v. Brown*, Civil No. 06–1213 (PAM/JSM), 2007 WL 4192000, at *4 (D.Minn. July 16, 2007) (same).

 The comments in *Keating* also point up a defect in Respondents' premise: the Fifth Amendment protects a party from self-incrimination; it does not protect someone from having to invoke the right to avoid self-incrimination in the first place. "There is no violation of due process where a party is faced with the choice of testify-

ing or invoking the Fifth Amendment." *Gellis v. Casey,* 338 F.Supp. 651, 653 (S.D.N.Y.1972); *see Kordel,* 397 U.S. at 7–8, 90 S.Ct. 763 (finding nothing improper about forcing a party either to testify at the risk of "forfeiting [his employer's] property" or to assert the Fifth Amendment privilege). In other words, there is no pre-incrimination right not to have to use the Fifth Amendment except as a measure of last resort.[2]

■■■■ Secondly, Respondents claim, but fail to demonstrate, that the only practical purpose of the interviews would be pursuing adverse inferences. The SEC submits that the interviews will advance its investigation. At oral argument, it clarified that it hopes to gather at least some information from Respondents that will propel its inquiry without incriminating them. In reply, Respondents made the sweeping proclamation that any relevant questions will trigger the Fifth Amendment privilege. However, "[t]he privilege cannot be invoked on a blanket basis." *United States v. Castro,* 129 F.3d 226, 229 (1st Cir.1997); *see SEC v. First Fin. Group of Tex., Inc.,* 659 F.2d 660, 668 (5th Cir.1981) (stating that the Fifth Amendment does not authorize "blanket assertion[s] of the privilege"); *United States v. Highgate,* 521 F.3d 590, 594 (6th Cir.2008)

(finding that the district court "erred by not inquiring into the legitimacy or scope of [a witness's] claimed privilege" where the witness "made a blanket assertion of his privilege"). "It operates question by question. Thus, the district court must conduct a 'particularized inquiry'" into each claim of privilege. *Castro,* 129 F.3d at 229.

Therefore, Respondents cannot be excused from the interviews by predicting that all questions will be off-limits. Instead, the proper procedure is for them to appear for questioning "and as to each question ... elect to raise or not to raise the defense." *First Fin. Group,* 659 F.2d at 668. To hold otherwise could deprive the agency of non-privileged information that may be valuable to the investigation. That risk illustrates the perils of "intrud[ing] into the investigative agency's function." *Howatt,* 525 F.2d at 229. Absent evidence of bad faith, the Court must not second-guess the Commission's decisions in carrying out its mandate.

The Court perceives no bad faith here. It credits the agency's representation that it is not simply chasing adverse inferences. Again, it is not the Court's place to tell the Commission how to use the interviews. Nevertheless, if it later turns out that the

2. Respondents' reliance on *Brock v. Tolkow,* 109 F.R.D. 116, 120 (E.D.N.Y.1985) does not rescue their argument. In that case, the Court did grant a protective order deferring civil discovery pending the outcome of a criminal investigation. *Brock,* 109 F.R.D. at 119–20. However, as grounds for the order, *Brock* fretted that, without a stay, the parties would have to "decide whether to respond [to civil interrogatories] or to assert their rights under the [F]ifth [A]mendment." *Brock,* 109 F.R.D. at 120. For the reasons discussed above, in the Court's view that worry was misplaced. Moreover, even if that concern were valid, it would carry less force under these circumstances than it did in *Brock.* In that case, the defendants sought to escape

discovery propounded by the plaintiff in a civil lawsuit. Thus, they pleaded that having to invoke the Fifth Amendment would "hamper their ability to defend the civil suit." *Id.* at 118. Here, the Commission has not sued Respondents, and may choose not to do so. It is thus not clear whether stonewalling the SEC on Fifth Amendment grounds will have any impact at all on Respondents' ultimate liability. To be sure, doing so will prevent Respondents from cooperating, and from presenting their version of the facts. But that is one step removed from having to stand in silence while the Commission builds a case against them before the Court or a jury. In that scenario, there would be no escape from adverse inferences.

Commission's designs were tactical all along, corrective steps can be take at that time. This Court, or whichever court ends up presiding over any trial of the Commission's claims against Respondents, can preclude use of the interviews for the purpose of adverse inferences. Thus, to the extent that the Subpoenas implicate legitimate Fifth Amendment concerns, "there are less drastic methods in lieu of a stay to protect the [Respondents'] rights." *Digital Equip. Corp. v. Currie Enters.*, 142 F.R.D. 8, 13 (D.Mass.1991) (declining to grant a stay of civil discovery despite the risk of adverse inferences, and noting that the court could limit the plaintiffs' use of information obtained).

### 2. Document Subpoenas

■ As for the document Subpoenas, Respondents assert that the "act of production" itself would be incriminating.[3] It is plausible that relinquishing some of the requested materials could amount to "a tacit concession that the records exist, are in [Respondents'] possession, and are authentic." *In Re Grand Jury Subpoena,* 973 F.2d 45, 51 (1st Cir.1992). Yet, there are substantive limits to the "act of production" doctrine. *See, e.g., Amato v. United States,* 450 F.3d 46, 48 n. 1 (1st Cir.2006) (explaining that the doctrine applies "only where the act of producing the evidence would contain 'testimonial' features") (citation and quotation marks omitted); *United States v. Feldman,* 83 F.3d 9, 14 (1st Cir.1996) ("[T]hough the Fifth Amendment protects against ... the compelled production of private documents when the act of production itself is incriminating, the Amendment does not act as a general bar to the production of private information voluntarily prepared."). This

means that, just as with the testimonial Subpoenas, "blanket" invocation of the Fifth Amendment does not get Respondents off the hook. *First Fin. Group,* 659 F.2d at 668. Rather, the proper procedure is for Respondents to "elect to raise or not to raise the defense" with respect to each document responsive to the Subpoena. *Id.* They may do so by cataloguing any documents they hope to withhold in a privilege log.

### B. Annuitant deposition transcripts

■ The remaining dispute concerns whether the Commission can obtain the Rule 15 deposition transcripts from either Respondents or the civil plaintiffs. Respondents contend that the SEC should not be allowed to view the transcripts at all, because they do not "exist ... as a matter of law." (Resp'ts Mem. 20.) The Court authorized the depositions for the sole purpose of "preserv[ing] trial testimony" in the event the government brings criminal charges. *Grand Jury Proceedings,* 2010 WL 1038206 at *3 n. 4. The depositions were not intended "for any other improper purpose, such as to pursue discovery." *Id.* (citing *United States v. Poulin,* 592 F.Supp.2d 137, 145 (D.Me. 2008) (explaining that Rule 15 does not authorize discovery in criminal matters)); *see United States v. Carrigan,* 804 F.2d at 599, 602 (10th Cir.1986) (discussing the text of Rule 15 and the Advisory Committee's notes, and stating that the Rule "does not contemplate use of depositions of adverse witnesses as discovery tools in criminal cases"). Respondents stress that the Court even warned the government that it did not expect the depositions to be presented to the Grand Jury. *See Grand Jury*

---

**3.** The individual Respondents object to both the testimonial and document Subpoenas directed at them. The corporate entity, Estate Planning Resources, has indicated that it will release all requested documents except for the Rule 15 deposition transcripts, which are discussed below.

*Proceedings*, 2010 WL 1038206 at *11 ¶ 6. And because the civil plaintiffs participated in the depositions only pursuant to the limited Rule 15 relief granted to the government, Respondents declare that the same rules carry over to the transcripts in their possession. The depositions still cannot be used for discovery, they reason, and therefore cannot assist the agency's investigation.

The Commission replies that Respondents are attempting to wrap the transcripts in a veil of secrecy unauthorized by law or this Court's orders. The Commission acknowledges the Court can curb use of the transcripts as it sees fit, if the "interest[s] of justice" so require, under Rule 15. *See* Fed.R.Crim.P. 15(a)(1). Yet, nothing in the Rule, the Commission points out, or in the Court's earlier order, places any restrictions on the depositions that apply outside criminal proceedings. Thus, the Commission reasons, there is no basis for preventing their disclosure in a civil enforcement action.

The Court concludes that in the unique circumstances of this case, the Commission's position is largely correct. To explain why, a brief recap of prior rulings in these matters is necessary.

First, the government asked for the extraordinary relief of pre-indictment depositions. The Court granted the request because of the witnesses' extremely short life expectancy: at the time, "over one hundred witnesses [had] already perished." *Grand Jury Proceedings*, 2010 WL 1038206 at *1. Because the procedure was unprecedented, the Court strove to guard against any misuse of Rule 15 as a tool for criminal discovery. Accordingly, it sought assurance from the government that it would not share the transcripts with the Grand Jury. Yet, the Court also respected the limits on its own authority:

While the Court may not order that the [g]overnment refrain from using such depositions in the Grand Jury, the Court takes the government counsel at their word that this is not the purpose and intent of the depositions; use of the depositions at Grand Jury therefore would subject counsel to the remedial and disciplinary authority of this Court.

*Id.*, 2010 WL 1038206 at *11. Thus, the Court did not issue an order that the Grand Jury could not see the transcripts. It simply admonished the government that deviating from its plans could result in sanctions.

Second, soon after filing the civil lawsuits, the plaintiffs in those cases moved to depose the witnesses on an expedited basis pursuant to Rule 30(a) of the Federal Rules of Civil Procedure. There was no question that the witnesses possessed information central to the civil claims. Therefore, the civil parties also had a valid interest in preserving the witnesses' testimony for trial, and one that was just as urgent as the government's because of the witnesses' imminent death. Yet, rather than subject individuals with fragile health to the stress of duplicative interviews, all parties agreed to a compromise: the civil plaintiffs would be allowed to participate in the Rule 15 depositions, but would respect the government's decisions about who was healthy enough to query. The primary purpose of the compromise, of course, was protecting civil trial testimony. Yet, a practical consequence was that the civil plaintiffs learned what the witnesses had to say. From that perspective, the civil plaintiffs obtained the discovery they sought. `

Both of those decisions were situation-specific. Neither decreed the legal status of the depositions for all time and all purposes. Rather, that status evolved as the Court navigated the parties' competing in-

terests while endeavoring to show some mercy to the witnesses.

Now, the Court faces a third controversy, and circumstances have again shifted. The Commission wants the deposition transcripts too, and the Court cannot see any principled reason to deny the request. The origin of the transcripts as a measure to preserve trial testimony does not mean that all other uses are *per se* improper. In particular, Respondents cite no authority that forbids revealing Rule 15 depositions to a party conducting a civil investigation. On the contrary, as the second ruling discussed above demonstrates, disclosing the depositions in civil proceedings does not violate either Rule 15 or the Court's order in *Grand Jury Proceedings*. The Rule and the *Grand Jury Proceedings* order do not address civil matters at all; both speak only to criminal trial testimony preservation. *See Carrigan*, 804 F.2d at 602. Neither locks the transcripts inside a procedural fortress.

Nor do the "interest[s] of justice" command withholding the depositions from the Commission; in fact, they command the opposite result. *See* Fed.R.Crim.P. 15(a)(1). As an executive agency charged with civil enforcement of federal laws, the SEC stands somewhere between the government and the civil plaintiffs. What would be just about depriving the Commission of critical evidence that the civil plaintiffs, as well as counsel for the government, already possess?[4] But for an accident of timing, the transcripts might have been full-blown public documents from the start. The only reason any limitations apply is because the government, and not the civil plaintiffs or the Commission, initially approached the Court. If, for instance, the civil plaintiffs had first identified the witnesses, and petitioned to take their depositions before filing complaints, the Court might very well have granted the request pursuant to Rule 27 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 27(a)(1) (allowing depositions before an action is filed in limited circumstances). In that case, the contents of the depositions might have been a matter of public record. The fact that events did not unfold in that sequence does not now justify a protective order cropping the Commission's power of subpoena.

Moreover, as with the order authorizing the civil plaintiffs to participate in the depositions, letting the Commission have the transcripts reduces the burden on the witnesses. As Respondents concede, if the Court finds in their favor, the Commission could simply subpoena the witnesses directly. This Order spares them from potentially undergoing another round of questioning.

Finally, the Court can preserve the intent of the *Grand Jury* order by preventing any broader distribution of the transcripts that might make it more difficult to keep their contents secret from the Grand Jury. The Commission's own default rules require treating information obtained during the course of an investigation as confidential. *See* 17 C.F.R. § 240.0–4 (2009). While the regulations allow the Commission itself to authorize public disclosure of the contents of an investigation, *see id.*, the Court hereby orders the Commission not to release the transcripts without first seeking permission from the Court.

---

4. Technically, of course, the real party to the criminal investigation is the Grand Jury, which has not seen the transcripts; but if an indictment is forthcoming the party in the ensuing trial would be the government. Compared to the government, the Commission is a hybrid between counsel and client, since the agency itself is the investigative body. Yet, the government's counsel does have the transcripts, as do both the civil plaintiffs and their counsel.

### III. Conclusion

For the reasons stated above, the Commission's Motion to direct the Respondents to comply with its Subpoenas is GRANTED. Respondents shall respond to the documentary and testimonial Subpoenas within 30 days of the entry of this Order. Respondents' request for a protective order is DENIED, and the Commission is thus entitled to the Rule 15 deposition transcripts subject to the following condition: the Commission shall assure that the transcripts and their contents are not shared with anyone who is not a member, officer, or employee of the Commission. If the Commission desires to make the transcripts or their contents available to any other parties in the future, it shall first apply to the Court for permission.

IT IS SO ORDERED.